**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARTOR KIKI BROWN,** | : | **Civil No. 3:18-CV-1527** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **LT. MAXWELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

We are now called upon to write the final chapter in this longstanding civil rights lawsuit. This action was brought in 2018 by the plaintiff, Gartor Brown, a former state inmate who was incarcerated in the Pennsylvania Department of Corrections ("DOC"), against several DOC employees. The remaining defendants are Lieutenant Maxwell, Officer Plocinik, Officer Johnston, and Officer Fochtman. Brown alleges that her[1] Eighth Amendment rights were violated when she was placed in a cell at SCI Huntingdon and assaulted by her cellmate over the course of several days in February of 2018.

---

[1] During the course of this litigation, we were made aware that Brown identifies as transgender and uses female pronouns. Accordingly, we will refer to Brown by her preferred pronouns.

Thus, what now remains in this lawsuit is a single Eighth Amendment failure to protect claim along with a related Eighth Amendment medical care claim lodged against four individual correctional defendants.[2] With respect to these sole surviving legal claims, the evidence presents us with two stark and irreconcilable factual narratives. For her part, Brown alleges that the defendants knew she was at risk of being assaulted when they placed her in a cell with inmate Raheem Allen on February 3, 2018. Brown insists that she was then immediately and brutally assaulted by Allen in the presence of the defendants, who did nothing to protect her. According to Brown, she repeatedly complained of these unrelenting assaults as they happened over the next five days, and the defendants did nothing to stop her cellmate from assaulting her. Brown further alleges that she was denied medical care after reporting the alleged assaults.

The consistent testimony of the defendants is entirely at odds with the factual narrative presented by Brown. According to the defendants, during the relevant time frame, from February 3 through 7, 2018, Brown never complained that she was being assaulted by inmate Allen. Further, there was no evidence or indication that Brown had suffered any injuries whatsoever until the last day of her confinement with

---

[2] When Brown initially filed this lawsuit in 2018, there were additional claims and defendants named in her pleadings. Through the process of litigation a number of those parties and allegations were dismissed prior to the assignment of the case to the undersigned. Those prior rulings remain the law of the case and are not addressed in this opinion since no party has invited us to reconsider these prior rulings.

inmate Allen, February 7, 2018, when staff observed that Brown had a bloody nose. At that time, staff inquired regarding whether Brown had been assaulted by her cellmate, and the defendants reported that both Brown and Allen denied that she had been injured by Allen.

In order to attempt to reconcile these conflicting narratives, a three-day nonjury trial was held in front of the undersigned in January of 2023. As discussed below, beyond Brown's own narrative of events, that trial provided only scant support for her claims that the defendants were deliberately indifferent to her safety and well-being. In contrast, the testimony of the defendants rebutting Brown's claims was consistent, mutually corroborative, and supported by the testimony of other witnesses, as well as medical records which contradicted Brown's assertions that she had suffered repeated severe injuries at the hands of another inmate.

Following this trial we also provided the parties the opportunity to submit post-trial briefs. Accordingly, this matter is now ripe for resolution.[3] After consideration of the testimony and evidence produced at trial, we find that the plaintiff has failed to prove that the defendants violated her Eighth Amendment

---

[3] Briefing in this case closed on March 1, 2023. (Doc. 251).

rights.[4] Therefore, for the following reasons, we will enter judgment in favor of the defendants against the plaintiff.

## II.   __Background__[5]

Brown was an inmate in the Pennsylvania DOC housed in the Restricted Housing Unit ("RHU") at SCI Huntingdon at all relevant times during the incidents alleged in the complaint. Brown's complaints arise out of alleged assaults by her cellmate, Raheem Allen, in February of 2018 while she was incarcerated in the RHU at SCI Huntingdon.

At the time of these events, Brown was serving a sentence in state prison for a crime of violence committed while Brown was in custody; specifically, aggravated harassment by a prisoner. (Def. Ex. 7, DEF 20). Brown was gay and she also identified as transgender. In addition, Brown had a significant mental health history, which had manifested itself in a variety of ways including Brown's ingestion of her own excrement. Indeed, during the relevant time period, Brown's mental illness was

---

[4] Brown proceeded *pro se* at trial. While we find in favor of the defendants, we commend Brown for the presentation of her case. We also commend defense counsel for the skill of their presentation, and for the many professional courtesies they extended to Brown in the course of these proceedings.

[5] This factual background is taken from the evidence and testimony elicited at trial and represents the facts which we find were established by a preponderance of the evidence.

documented on numerous occasions by prison psychiatric staff. (Def. Ex. 57, at 25-29).

These psychiatric treatment notes recorded Brown's mental health challenges, which manifested themselves in several ways. First, Brown acknowledged odd excretory behaviors, admitting that she had been "playing" with her feces. (Id., at 25, 26). Brown also claimed to hear voices. (Id., at 26). Yet, despite asserting that she suffered from these symptoms of mental illness, Brown frequently resisted efforts at counseling and treatment.  Instead, Brown cited these alleged mental health symptoms as she repeatedly demanded that she receive single cell status. This conduct led some health care providers to conclude that Brown's erratic behavior was manipulative conduct designed for secondary gain through acquisition of what is called a "Z code," or single cell status. (Id., at 26-28).

Brown's efforts to obtain single cell status were also occasionally marked by threats of violence. For example, on December 1, 2017, it was reported that Brown threatened to " 'kill' someone if housed double." (Id., at 28). Brown also amassed a significant disciplinary history while housed at SCI Huntingdon. (Def. Exs. 85-89). These disciplinary infractions frequently involved Brown's insistence that she be single celled and her refusal to accept cellmates. Moreover, in several instances Brown resorted to threats of violence towards staff and others. Thus, in December of 2017, Brown was disciplined after she informed staff that "if you put me in with

a celly I am going to kill him." (Def. Ex. 87). This history of institutional misconduct punctuated by occasional threats of violence led to Brown's placement in the RHU at SCI Huntingdon in February of 2018.

At trial, Brown and the defendants testified to the events leading up to the alleged assaults in February of 2018. Thus, in October of 2017, Brown was transferred to SCI Huntingdon. According to Brown, upon her intake at Huntingdon, she informed DOC officials, including Lieutenant Maxwell, that she was homosexual. Brown also testified that she identified as transgender, but that she did not inform DOC officials of her transgender status at that time for fear of drawing attention to herself. Brown stated that at her intake, she had to sign a double celling agreement, and that she protested this agreement and informed DOC officials that she needed to be placed in a single cell. Nevertheless, Brown testified that she signed the agreement under duress. Brown was initially placed in a single cell for the first few days that she was housed at Huntingdon. After a brief transfer to SCI Camp Hill relating to a sexual assault allegation Brown had filed at that institution, Brown returned to SCI Huntingdon on November 13, 2017. Brown contends that Lieutenant Maxwell and the other defendants knew of her sexual assault allegation that she made at Camp Hill.

Lieutenant Maxwell testified that he was, in fact, part of the intake team when Brown arrived at SCI Huntingdon in October of 2017. For his part, Maxwell stated

that Brown was given a double celling agreement, and that signing the papers simply acknowledged that Brown received the paperwork. Maxwell testified that unless there was a particular reason for an inmate to be placed in a single cell and receive "Z code" status, all inmates were housed with a cellmate. The paperwork given to Brown explained double celling and how to go about requesting a single cell if the inmate was concerned about double celling.

On this score, Maxwell testified regarding the housing placement of certain inmates. Maxwell stated that inmates who were in disciplinary custody ("DC") were not to be housed with inmates in administrative custody ("AC"). Further, inmates who were either identified as a victim of prior assaults or an abuser were listed as "housing concerns." Maxwell testified that victims labeled a housing concern could be housed with other victims, and abusers with other abusers, but that victims and abusers would not be celled together. At the time of the alleged incident in February of 2018, Brown was listed as a housing concern and was DC status. (Def. Ex. 7). Allen was not listed as a housing concern at this time and was also DC status. (Id.) Lieutenant Maxwell testified that there were instances in which an inmate who was a housing concern could be celled with an inmate who was not designated as a housing concern.

On January 22, 2018, Brown was issued a misconduct by Officer Plocinik regarding Brown having property in her cell that belonged to another inmate. Officer

Plocinik testified that he was not responsible for deciding whether any disciplinary actions were appropriate with respect to this misconduct. Several days later, Brown received another misconduct for refusing to take a cellmate. As a result of these misconduct citations Brown was transferred to the RHU at SCI Huntingdon.

Brown testified that on February 2, 2018, Officer Plocinik moved her to a cell that was covered in blood and mace, and because Brown suffered from asthma, she asked to be removed from the cell. Brown testified that she was later told by Plocinik that she would be housed with inmate Allen. Brown stated that she informed Plocinik that she was afraid of Allen, and that Allen and a former cellmate of Brown's, Dale Jackson, knew of the prior assault she suffered at Camp Hill. According to Brown, notwithstanding her specific warnings to staff, on February 3, 2018, Brown was moved to cell 1008 in the RHU where she would be housed with inmate Raheem Allen.[6] Brown testified that she did not want to move into the cell with Allen, but that Officer Plocinik threatened to spray her with OC spray if she did not comply.

---

[6] Like Brown, Allen had a criminal history marked by violence. In Allen's case, he was serving a life sentence for murder. Moreover, like Brown, Allen had amassed a significant disciplinary history. While Brown noted that this disciplinary history included instances of sexual misconduct, it appears that these disciplinary citations involved alleged sexual harassment of female prison staff. No party has identified instances of homophobic violence on Allen's part prior to February of 2018. Quite the contrary, it appears that Allen's prison records contained no notations indicating that there were housing concerns relating to double celling Brown with other prisoners.

These allegations were specifically denied by Officer Plocinik and no other witness confirmed Brown's account of these events. For his part, Officer Plocinik testified that Brown was never placed in a cell covered in mace and blood, and that he would not place an inmate in such a cell. He further stated that Brown never expressed concerns about Allen to him, and that while he was part of the team of officers that transferred Brown to cell 1008, he never threatened to spray Brown with OC spray.

Thus, Brown was transferred to cell 1008 on February 3, 2018. Brown testified that Allen was refusing to take Brown as a cellmate, and that he was referring to Brown as a "rat" and a "faggot." Brown further testified that Allen immediately began to assault her even while she was still handcuffed by the transport team, and that Officer Plocinik stood by and laughed as Allen hit Brown. She further stated that Officer Plocinik told Allen that Brown was a "rat" and a "faggot."

For his part, Officer Plocinik testified that Brown never refused to go into the cell, and that if Brown had refused or if Allen was refusing Brown as a cellmate, Brown would not have been placed in the cell with Allen. Officer Plocinik further testified that he did not witness Allen hit Brown while Brown was still handcuffed, and he did not call Brown any derogatory names in front of Allen. Moreover, there was no physical or medical evidence which supported Brown's claims that she was

subjected to an immediate, severe beating at Allen's hands in the presence of correctional staff.

Brown's allegations then span the next four days, in which she alleges she was assaulted each day by Allen, and that even after she reported the assaults to staff, nothing was done to stop the assaults. Thus, Brown claims that on February 4, 2018, she encountered Officers Plocinik and Fochtman, who brought the inmates their dinner trays. She alleges that Plocinik gave Brown's dinner tray to Allen, who would allegedly keep it from Brown and not let Brown eat her dinner. Brown testified that this happened several days in a row, and that she complained to staff about it. However, Officer Plocinik testified that Allen had dietary restrictions, whereas Brown did not, and they received different meals. Plocinik further testified that Brown never expressed a concern regarding her meals.

On February 5, 2018, Brown claimed that she was violently assaulted by Allen who beat her about her head. Had Brown suffered severe head injuries at this time, as alleged by the plaintiff, her injuries would have been immediately apparent. However, no prison staff reported seeing evidence that Brown had been harmed on February 5, and her medical records do not document any clinical evidence of assault. Quite the contrary, inmate contact notes prepared by prison psychiatric staff on February 5 and 9, 2018, contain no reference to Brown reporting these physical assaults by inmate Allen. However, the treatment notes from February 5, 2018, state

that Brown "present[ed] as dangerous and manipulative in order to get what [s]he wants." (Def. Ex. 57, at 26).

Brown also alleges that she was sexually assaulted by Allen on February 7, 2018, and that Officers Plocinik and Johnston were present but walked away from the cell during the assault. Brown testified that she had blood all over her linens and jumpsuit, and she requested new linens and a new jumpsuit from Johnston. For his part, Officer Johnston testified that he was a CO Trainee working in the RHU on February 7. Johnston stated that he was making his rounds as the "punch man" in the unit when he was flagged down by Brown claiming that she had a bloody nose. Johnston contends that both Brown and Allen were in the cell at that time, that nothing looked out of order and there were no signs of a fight, and that Brown never told him Allen assaulted her. Rather, Johnston testified that he asked Brown if she needed medical attention, and Brown told him that she did not, and she requested new linens and a new jumpsuit.

Johnston reported Brown's complaint of a bloody nose to Sergeant Heaster in the control room. Sergeant Heaster testified that he sent Officer Fochtman to cell 1008 to check on the situation after Johnston reported it. He further testified that Officer Fochtman returned to the control room and reported that there were no signs of a fight, and that Brown requested new linens and a jumpsuit due to the bloody nose. Indeed, Officer Fochtman's testimony corroborates this account of events. On

this score, Fochtman testified that he went to cell 1008 at the direction of Sergeant Heaster. He asked both Allen and Brown if they had been fighting, and they both said they had not. Fochtman ordered them to come to the door one at a time so that he could inspect them, and he saw no physical injuries on either Brown or Allen or any indication that Brown had been assaulted. Fochtman stated that Brown told him that she sometimes gets bloody noses and that she did not need medical attention. Johnston, Heaster, and Fochtman all testified that Brown was asked if she needed to see medical, and Brown responded that she did not need medical attention at this time.

Brown further testified that on February 5, 6, and 7, 2018, she informed Plocinik that Allen assaulted her. Brown also stated that Officer Fochtman served her dinner trays with Plocinik on February 4 and 5, and that Fochtman was aware that Allen was assaulting her and threatened to continue to assault her. Both Plocinik and Fochtman deny that Brown ever told them she was being assaulted by Allen. According to Fochtman, both inmates asked to be moved to a different cell because they could not see the television on the unit from cell 1008, but neither inmate asked to be transferred for any other reason. Moreover, Maxwell, Johnston, Plocinik, and Fochtman all testified that there was no indication prior to Brown's alleged assault that Brown had any safety concerns about being housed with Allen.

On February 8, 2018, Brown was issued a misconduct for refusing to go to her cell after showers, stating that she was "not taking a cellie." Due to Brown's refusal to return to the cell, she was placed in a cell by herself. Brown was visited the next day by her counselor, Ms. Richards. Ms. Richards' notes reflect that during this contact, Brown's concerns were about her misconducts. Brown asked Ms. Richards if she could help get the misconducts resolved, and Ms. Richards declined to do so. Brown's only other concern was whether her family had called to check on her, and Ms. Richards told Brown they had not. Ms. Richards testified that if she had seen any indication that Brown was injured, she would have been required to report it.

Several days later, around 4:00 p.m. on February 13, 2018, while Brown was housed in a single cell, Plocinik ordered Brown to take a cellmate. Brown refused, and Plocinik issued Brown a misconduct for refusing an order. A few hours after Plocinik issued the misconduct, Brown submitted a sick call slip in which she claimed that she had been sexually assaulted by Allen. The sick call slip reflects that Brown claimed she was assaulted by Allen from February 3 to February 7, and that Allen sexually assaulted her on February 7. Brown complained of a broken nose and bleeding from her anus. This sick call slip was received by LPN Anata Trice. LPN Trice testified that when she received the sick call slip, she considered it to be an issue implicating the Prison Rape Elimination Act ("PREA"). Accordingly, she

immediately notified her supervisor and Lieutenant Orndorf, the PREA coordinator who was working that night.

LPN Trice testified to the procedure that was followed when staff received a PREA allegation. She stated that inmates who filed a complaint implicating PREA were seen the same day they make the complaint. She testified that DOC staff do an initial medical workup of the inmate to get a basic medical assessment, and within 72 hours, the inmate would be sent to an outside provider to be examined. The case is then turned over to the PREA Lieutenant to conduct an investigation. Lieutenant Maxwell, who was a PREA Lieutenant at this time, testified that when he received a PREA complaint, he would speak to the alleged victim and abuser separately, pull their cell histories and any video evidence if it was deemed relevant, and if a sexual assault was alleged, he would contact the Pennsylvania State Police.

Thus, LPN Trice testified that Brown and Allen were separated that night, and Brown was taken to another room to talk about the allegations she made in her sick call slip with Trice and Lieutenant Orndorf. LPN Trice described Brown's demeanor as calm, and she noted no visible physical injuries or signs of a struggle. Brown reported to her that she was physically abused by Allen and sexually assaulted. Brown claimed that she requested medical attention, but the correctional staff refused. When it came time to do a medical assessment, LPN Trice testified that Brown refused to cooperate and refused all medical attention. Brown would not

allow Trice to take pictures or render any medical attention to her. LPN Trice further stated that Brown reported that she was fine now that she was in a single cell.

LPN Trice testified that it was unusual for an inmate who had reported a sexual assault to refuse to cooperate and refuse all medical care, and further, that the report was made almost a week after the alleged assault. Indeed, according to LPN Trice, Brown's refusal to cooperate in a physical examination was unique in her long experience dealing with inmates who alleged that they had been sexually assaulted. Simply put, LPN Trice testified that prior to this encounter with Brown, no inmate who claimed to be a victim of sexual assault had refused examination and treatment. Given Brown's refusal to cooperate, and her statement that she was fine now that she had a single cell, LPN Trice stated that her impression was that Brown was trying to obtain Z code status by making the PREA complaint. For her part, Brown denies this, and she testified that LPN Trice refused to provide her medical attention. On the following day, February 14, 2018, Brown finally agreed to allow medical staff to conduct a physical examination. That examination provided no clinical support for Brown's claims that she had endured repeated beatings and sexual assaults at the hands of inmate Allen the week before. Instead, these clinical notes indicated that Brown had no apparent injuries whatsoever. (Def. Ex. 7, DEF 118-19, 125-32).

Lieutenant Maxwell also testified as to his PREA investigation conducted in Brown's case. Thus, following Brown's complaint, Maxwell opened an

investigation the next day, February 14, 2018, and contacted the state police. He stated that a PSP Trooper arrived that day, and they began conducting interviews of staff, as well as interviews of Brown and Allen. During the investigation, Brown refused to submit a written statement, which Lieutenant Maxwell testified was unusual in cases involving sexual assault, but Brown verbally stated that Allen had physically and sexually abused her. Allen was also interviewed, and he gave a written statement denying that he assaulted Brown. Several staff members, including Officers Plocinik, Fochtman, and Johnston, as well as LPN Trice, were interviewed. Fochtman stated that Brown never informed him of any assault by Allen, and that the only complaint he received from both inmates was that they wanted to move to a different cell so they could see the television. Johnston stated that the only complaint he received from Brown was a complaint of a bloody nose. Plocinik stated that he never witnessed Allen assaulting Brown, and that Brown never complained to him that she was being assaulted by Allen. LPN Trice stated that Brown refused medical treatment following her complaint, and that Trice saw no injuries on Brown.

Thus, Lieutenant Maxwell testified to his investigative findings and his conclusion that Brown's allegations of physical and sexual assault by Allen were unfounded. Maxwell stated that he determined the staff reports to be credible, and that there were multiple records in Brown's file indicating she attempted to manipulate staff and obtain a Z code. He further testified that he found Brown's

allegations not credible because Brown had opportunities to report the alleged assault and did not, and that Brown refused to cooperate with the medical assessment or with the investigation. The PSP investigation similarly concluded that Brown's allegations were unfounded. Accordingly, Lieutenant Maxwell's recommendation was to close the investigation. Maxwell testified that after he made his recommendation, the investigation went through a chain of command, up to and including the Superintendent of the facility and the Central Office, before it was closed.

Brown received notice of the results of the investigation on April 26, 2018. That same day, she received a misconduct from Maxwell for lying to staff given that her allegations were unfounded. Lieutenant Maxwell testified that a misconduct for lying to staff was the course of action followed when a PREA complaint was deemed unfounded. Following the results of the investigation, Brown later made allegations against Officer Plocinik, which were also determined to be unfounded. Brown again received a misconduct for lying to staff regarding this incident in December of 2018.

Brown initially filed the complaint in this case on August 1, 2018 and amended the complaint thereafter. (Docs. 1, 25). After the defendants moved for summary judgment, only the Eighth Amendment deliberate indifference and failure to protect claims against all four defendants, as well as a claim for the denial of medical care against Officers Johnston and Fochtman, remained. (Doc. 137). A

three-day[7] nonjury trial was then held in this case in January of 2023, during which time the parties presented testimony and evidence regarding the Eighth Amendment claims against the remaining individual defendants. After the presentation of evidence had concluded, we took the matter under advisement.

After consideration of the evidence and testimony presented at trial, as discussed below, we conclude that the plaintiff has not proven the Eighth Amendment failure to protect or denial of medical care claims against any of the remaining individual defendants. Therefore, we will enter judgment in favor of the individual defendants.

## III.   **Discussion**

As we have explained, Brown's claims against the defendants implicate the Eighth Amendment, as she contends that the defendants failed to protect her from being assaulted by Allen, and that she was refused medical care following the alleged assault. However, after a review of all of the evidence, we conclude that Brown has not proven that the defendants violated her Eighth Amendment rights. Specifically, Brown has not shown that she suffered any serious risk of harm. Furthermore, Brown has not carried her burden of proving that any of the individual defendants knew of

---

[7] Given the numerous logistical hurdles we encountered while scheduling trial dates in this matter, including the fact that the plaintiff is now in the custody of immigration officials rather than the DOC, as well as COVID-19 concerns, we elected to proceed with this nonjury trial over the course of several, nonsequential days, with trial testimony taken on January 10, January 18, and January 23, 2023.

a serious risk of harm to her, or that they were deliberately indifferent to that risk. Moreover, Brown has not shown that Defendants Johnston and Fochtman were aware of a serious medical need of Brown's, and further, that they ignored that serious medical need and failed to provide Brown with medical attention.

Therefore, we will enter judgment in favor of the defendants.

## A. **Eighth Amendment – Legal Standards**

Several overarching and animating constitutional considerations govern analysis of any Eighth Amendment claim. As the Court of Appeals has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.
>
> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S. Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an

> 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

<u>Fuentes v. Wagner</u>, 206 F.3d 335, 344–45 (3d Cir. 2000).

Thus, while prison officials may violate an inmate's rights under the Eighth Amendment to the United States Constitution by displaying deliberate indifference to a substantial risk of serious harm to an inmate, an inmate asserting a failure to protect claim must make a precise showing to prove that claim. To sustain such a claim an inmate must:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u> "Deliberate indifference" is a subjective standard under <u>Farmer</u>-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

<u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 125 (3d Cir. 2001).

This deliberate indifference standard is an exacting benchmark for constitutional tort liability under the Eighth Amendment. As we have observed:

> As explained in <u>Beers–Capitol</u>, in cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." <u>Id.</u> at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

confinement unless the official knows of and disregards an excessive risk to inmate health or safety.' " Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970).

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates. The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842, 114 S.Ct. 1970. The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

Quarles v. Palakovich, 736 F.Supp.2d 941, 947–48 (M.D. Pa. 2010).

Thus, the Eighth Amendment deliberate indifference standard, at a minimum, calls for knowledge of some substantial risk to the health and safety of inmates, and a failure to act in the face of that known danger. There is a necessary corollary to this deliberate indifference standard. Specifically, it is clear that the concept of "deliberate indifference entails something more than mere negligence." Farmer, 511

U.S. at 835, 114 S.Ct. 1970. Therefore, a mere accident or inadvertence on the part of corrections officials does not violate the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976). Even where a plaintiff has presented sufficient evidence to allow a factfinder to reach the inference that a prison official had knowledge of the risk on the basis that risk was obvious, it is clear that an inference may not be compelled, and that the prison official must be permitted to show that he was actually unaware of the risk in question. Beers–Capitol, 256 F.3d at 132. Lastly, a prison official who is shown to have been actually aware of a risk to a prisoner-plaintiff can avoid liability if he shows that he responded reasonably to the risk, even if the response did not avoid the ultimate harm. Id.

These principles also apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when officials are deliberately indifferent to an inmate's serious medical needs. Estelle, 429 U.S. at 105. To establish a violation of his constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104, 97 S.Ct. 285.

Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106, 97 S.Ct. 285. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g., Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights')." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). "The key question ... is whether defendants have provided plaintiff with some type of treatment, regardless of whether it is what

plaintiff desires." <u>Little v. Lycoming Cnty.</u>, 912 F.Supp. 809, 816 (M.D. Pa. 1996) (internal quotations and citations omitted).

It is against these legal benchmarks that we assess Brown's claims against the defendants.

**B. <u>Brown has Not Shown that the Defendants Violated Her Eighth Amendment Rights.</u>**

Turning to the case before us, we find that Brown has not proven that the individual defendants violated her Eighth Amendment rights. At bottom, there are two elements to any Eighth Amendment claim. To establish this claim Brown must show both: (1) a risk of some serious injury and (2) the defendants' deliberate indifference to that risk.

In this case, Brown has failed to carry her burden of proof on either of these two essential elements of her Eighth Amendment claims. At the outset, Brown has not shown that she was subjected to serious bodily injuries at the hands of a fellow inmate between February 3 and 7, 2018. In fact, a number of the specific injury claims made by Brown are thoroughly contradicted by the greater weight of the evidence. For example, Brown's assertion that she was immediately and savagely beaten by Allen in the presence of correctional staff while she was still held in restraints is contradicted by every other witness and draws no support from the prison's medical records. Likewise, Brown's allegations that she was brutally beaten about the head on the evening of February 5, 2018, is completely unsupported by

any other proof and seem at odds with the clinical evidence. Furthermore, inmate contact notes prepared by prison psychiatric staff on February 5 and 9, 2018, contain no reference to Brown reporting these physical or sexual assaults by inmate Allen, but state that Brown "present[ed] as dangerous and manipulative in order to get what [s]he wants." (Def. Ex. 57 at p. 26).

In fact, the only physical evidence of any injury to Brown was the nosebleed that she suffered on February 7, 2018. However, this injury, standing alone, is insufficient to establish Brown's Eighth Amendment claim for several reasons. At the outset, it is well settled that in the absence of some expert witness testimony to the contrary, the  seriousness of a nosebleed as a medical condition would not be apparent to a layperson like the defendants.  McFadden v. Dalmasi, No. CV 17-5787, 2019 WL 6218220, at *8 (E.D. Pa. Nov. 21, 2019), aff'd, 837 F. App'x 135 (3d Cir. 2020) (citing Williams v. Guard Bryant Fields, 535 F. App'x 205, 212 (3d Cir. 2013)).

Moreover, the evidence indicates that both Brown and Allen denied that the nosebleed was the result of any physical confrontation between these prisoners, and for her part, Brown declined medical care at this time. Moreover, even when Brown belatedly reported this alleged assault one week later, she initially declined any medical examination by prison staff. Finally, once Brown consented to an examination on February 14, 2018, that examination revealed no apparent injuries.

Therefore, Brown simply has not carried her burden of proof regarding this first essential element of her Eighth Amendment claims, that she actually suffered significant physical injuries at the hands of a fellow prisoner.

In addition, Brown has not shown that the individual defendants knew of any substantial risk to her safety. While Brown testified that she informed these prison officials that she was afraid of Allen, all four defendants testified that Brown never expressed a concern about being housed with Allen.[8] Rather, the defendants' testimony, as well as testimony from other witnesses, credibly established that Brown did not want to have *any* cellmate, and that Brown tried to obtain Z code, or single-cell status and refused to take cellmates on many occasions. Indeed, Brown was issued several misconducts for refusing a cellmate prior to being celled with Allen in February of 2018. Additionally, while Brown testified that she had requested a separation from Allen, and thus the defendants should not have celled her with Allen, the evidence indicates that Brown did not request a separation from Allen until February 16, 2018, nine days *after* the alleged assault took place. (Pl. Ex. 36).

---

[8] Brown attempted to bolster this testimony by presenting copies of various documents she alleged that she submitted to correctional staff reporting her concerns. However, the vast majority of these documents were prepared by Brown after-the-fact and provided no basis for concluding that these defendants were aware of risks to her safety at the time of these events between February 3 and 7, 2018.

Moreover, while Brown testified that Lieutenant Maxwell knew of her homosexual status and prior allegations of assault at Camp Hill, Maxwell testified that an inmate is not given a Z code simply because he or she is homosexual or has made prior complaints of assault. Indeed, Maxwell stated that Brown was listed as a "housing concern" and Allen was not, but that there were instances in which an inmate labeled a "housing concern" could be celled with an inmate who was not. Brown points to Allen's history of misconducts involving sexual harassment and invites us to infer from these misconducts that Allen was a sexual predator and that the defendants knew he was a predator. However, as we have noted, Allen's misconducts related to Allen exposing himself to female staff members. On this score, Maxwell testified that Allen's misconducts for those instances would not have given staff any indication that Allen would assault a cellmate. Maxwell further stated that while he was aware that Brown made a complaint at Camp Hill, he was not involved in, nor did he know the results of that investigation. Accordingly, as to Lieutenant Maxwell, Brown has not established that this defendant knew of a substantial risk of harm to her and was deliberately indifferent to that risk.

We reach a similar conclusion with respect to the other individual defendants. First, with respect to Officers Johnston and Fochtman, the evidence established that Johnston's only contact with Brown was on February 7, 2018. While Brown testified that Johnston witnessed Brown being assaulted by Allen, and that Johnston failed to

intervene, Johnston testified that he never witnessed an assault by Allen on this date. Rather, Johnston testified that he was flagged down by Brown because she had a bloody nose, and that there was no evidence that Brown and Allen had been fighting or that Brown was injured. We credit this testimony, which was corroborated by Officer Fochtman's testimony that he went to Brown's cell and found no evidence of a fight, no injuries on either Brown or Allen, and that both inmates told Fochtman they had not been fighting. Accordingly, Brown has not shown that Johnston was aware of a substantial risk of harm to Brown and was deliberately indifferent to that risk.

With respect to Officer Fochtman, the evidence established that Fochtman encountered Brown on February 4, 6, and 7, 2018. Fochtman testified credibly that Brown never reported any assaults to him on these dates. He further testified that Brown's only complaint about the cell was that she could not see the television. Indeed, Fochtman stated that both Brown and Allen complained of the inability to see the television from cell 1008. With respect to the encounter on February 7, Fochtman testified that he was sent by Sergeant Heaster to check on Brown and Allen after Johnston reported Brown's bloody nose to the control room. He stated that he inspected both Brown and Allen through the cell door, and that neither inmate had any visible injuries. He asked both inmates if they had been fighting, and they both responded that they had not. Further, he stated that Brown requested new linens

and a jumpsuit due to a bloody nose. We credit Officer Fochtman's testimony, which is corroborated by the testimony of both Officer Johnston and Sergeant Heaster. Accordingly, we find that Officer Fochtman was not deliberately indifferent to a risk of harm to Brown.

Nor can we conclude that either of these two defendants denied Brown medical care in violation of the Eighth Amendment. First, Brown has not established that she had a serious medical need to which the defendants were deliberately indifferent. As one court in this district has aptly stated, "[n]ot every condition is a serious medical need; instead, the serious medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme pain." Millhouse v. United States, 2021 WL 2412930, at *13 (M.D. Pa. June 14, 2021) (Kane, J.) (citing Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). Brown simply has not made the necessary showing here, where the evidence shows that the only injury Brown suffered at this time was a bloody nose that was not actively bleeding at the time she encountered correctional staff. Furthermore, both Johnston and Fochtman unequivocally testified that they asked Brown if she needed to see medical, and that Brown said she did not need to see medical. Sergeant Heaster's testimony confirms that of Johnston and Fochtman. Accordingly, we find that Brown has failed to establish that these defendants denied her medical care in violation of the Eighth Amendment.

Finally, with respect to Officer Plocinik, we find that Brown's failure to protect claim fails. On this score, Officer Plocinik testified that prior to moving Brown into cell 1008, he was not aware of any concerns that Brown had with respect to Allen. While Brown testified that she told Plocinik that she did not want to be celled with Allen, and that Allen assaulted her in front of Plocinik, Plocinik testified that he never witnessed Allen assault Brown, and that Brown never expressed safety concerns to him. Moreover, Plocinik testified credibly that had Brown refused to cell with Allen, or if Allen had refused to take Brown as a cellmate, Brown would have never been placed in cell 1008. Plocinik also testified that throughout the period between February 3 and February 7, 2018, Brown never told him that Allen was assaulting her. Accordingly, we cannot conclude that Officer Plocinik knew of and disregarded a substantial risk to Brown's safety.

In sum, Brown's allegations against these correctional staff are not supported by the record.[9] While Brown testified to her recollection of the events, her testimony is belied by every other witness who testified at the trial in this matter. Indeed, as we

---

[9] In her post-trial brief, Brown raises a host of issues pertaining to our evidentiary rulings at trial. (See Doc. 255). On this score, it is well settled that "[t]he admission or exclusion of evidence is a matter particularly suited to the broad discretion of the trial judge," United States v. Casoni, 950 F.2d 893, 902 (3d Cir. 1991), and our rulings on these evidentiary matters were put on the record during the trial in this case. Accordingly, while we decline Brown's invitation to revisit these evidentiary issues at this time, we note that Brown objected to these rulings on the record and thus, has properly preserved these issues for appeal.

have noted, the four correctional defendants testified that Brown never expressed safety concerns regarding being celled with Allen, and that Brown never reported an allegation of assault to them. Brown's counselor, Ms. Richards, testified that Brown never expressed safety concerns to her. LPN Trice testified that while Brown had accused Allen of physical and sexual assault, Brown refused all medical attention and had no visible physical injuries on her person when LPN Trice attempted to examine her. Moreover, Brown's testimony is contradicted by other undisputed evidence in the record, which we find establishes that Brown consistently refused to take cellmates, tried to obtain single-cell status, and made unfounded accusations against other inmates and staff. Thus, we simply cannot credit Brown's allegations in light of the overwhelming evidence to the contrary. Accordingly, given that the evidence does not support Brown's Eighth Amendment claims in this case, we will enter judgment in favor of the defendants.

IV.    **<u>Conclusion</u>**

      Accordingly, for the foregoing reasons, we find that the plaintiff has failed to prove that the defendants violated her Eighth Amendment rights. Thus, we will enter judgment in favor of the remaining individual defendants.

      An appropriate order follows.

*<u>S/ Martin C. Carlson</u>*
Martin C. Carlson
United States Magistrate Judge

DATED: March 3, 2023